IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

ARLINE TALIAFERRO,

         Plaintiff,

   v.

TRUMP ENTERTAINMENT RESORTS,
INC., d/b/a Trump Plaza Hotel &
Casino, et al.,

         Defendants.

HON. JEROME B. SIMANDLE

Civil No. 12-3883 (JBS/AMD)

**OPINION**

---

Appearances:

William B. Hildebrand, Esq.
LAW OFFICES OF WILLIAM B. HILDEBRAND, LLC
36 Tanner Street, Suite 300
Haddonfield, NJ 08033
    Attorney for Plaintiff

Mary Beth Clark, Esq.
Jenna M. Cook, Esq.
John M. Donnelly, Esq.
LEVIN, STALLER, SKLAR, CHAN & DONNELLY, PA
3030 Atlantic Avenue
Atlantic City, NJ 08401
    Attorney for Defendants

**SIMANDLE, Chief Judge:**

## I. Introduction

    Plaintiff Arline Taliaferro, a casino dealer at the Trump Plaza Hotel & Casino in Atlantic City, N.J., permanently injured her right hand and wrist, underwent surgery and took a leave of absence of more

than a year. When she returned to work, in 2010, she could deal only

certain games. Two and half years after the accident, and a year after

returning to work, Plaintiff was terminated.

Plaintiff claims she was fired because of her disability in

violation of the New Jersey Law Against Discrimination ("LAD"),

N.J.S.A. § 10:5-12, et seq. ("Count I"), and she also brings a claim

under the Employee Retirement Income Security Act ("ERISA"), as

amended by COBRA, 29 U.S.C. § 1161, alleging she was never given COBRA

notice of her right to continue health coverage ("Count II").

Defendants Trump Entertainment Resorts, Inc., Trump Plaza

Associates, LLC, and the Plan Administrator for the Trump Plaza Hotel

& Casino Group Medical Plan argue that Plaintiff was disabled and no

longer could perform her job, and after Defendants tried to

accommodate her by reassigning her within the company, she was

terminated for missing scheduled work. Defendants also maintain that

her health care coverage was terminated for non-payment of premiums

prior to her termination, and thus she was not entitled to COBRA

notice. Defendants add that estoppel bars Plaintiff from claiming

that she was qualified to perform the essential duties of her job,

based on representations she made to the Social Security

Administration ("SSA") in her successful application for Social

Security Disability Insurance benefits ("SSDI").

Before the Court are cross-motions for partial summary judgment

on the LAD claim [Docket Items 65 & 91], and Defendants' motion for summary judgment on the COBRA claim [Docket Item 121]. The key questions for the Court are whether Plaintiff adequately harmonizes the seemingly inconsistent representations she has made to the SSA and this Court about her ability to perform the essential duties of her job, and whether there is a dispute of material fact relevant to the legal inquiry of whether Plaintiff's employer-employee relationship was terminated in March 2011 or whether she was placed on reassignment due to her disability.

For the reasons explained below, the Court finds that Plaintiff has not adequately explained her inconsistent statements to the SSA and this Court, and thus she is barred from claiming she was qualified to perform her job under the LAD at the time of the onset date for her SSA disability. The Court further holds that the undisputed facts establish that Plaintiff was placed on reassignment and was not terminated due to her disability in March 2011, and therefore her non-payment of health insurance premiums predated her termination, eliminating Plaintiff's COBRA claim for statutory damages. The Court will grant Defendants' cross-motion for partial summary judgment on Count I and motion for summary judgment on Count II.

## II. Background

### A. Facts

#### i. Employment and medical treatment

In October 2008, Plaintiff Arline Taliaferro was working as a casino dealer at the Trump Plaza in Atlantic City, N.J., when a chair she was sitting on collapsed, causing injury to her right hand and wrist. (Statement of Undisputed Material Facts ("SMF") [Docket Item 65] ¶¶ 1-2.)[1] Plaintiff, who is right-handed, requested her duties be modified as a result of her injuries, and she was assigned to perform light duty in the transportation department. (Id. ¶¶ 3, 8.) In December 2008, Plaintiff had surgery on her hand or wrist and took a leave of absence until March 10, 2010. (Id. ¶¶ 4-5; Def. SMF ¶ 7.) Plaintiff ultimately was diagnosed with, or exhibited symptoms of, reflex sympathetic dystrophy ("RSD").[2] (Def. SMF ¶ 44.)

When Plaintiff returned to work, she sought to limit the games she was required to deal.[3] (SMF ¶ 7.) In May 2010, Plaintiff provided

---

[1]  The cause of the injury is not a material fact for purposes of this motion. Defendants neither admit nor deny the cause of injury. (Def. Supplemental Statement of Undisputed Material Facts ("Def. SMF") [Docket Item 91-2] ¶ 4.)

[2] Plaintiff appears to deny this statement of fact, emphasizing that Dr. Park stated she "may have a component of RSD" (Pl. Response to Def. SMF ¶ 44), but the allegation that Plaintiff suffers from RSD is contained in Paragraphs 8 & 15 of Plaintiff's Amended Complaint.

[3] Plaintiff asserts that this is because she had limited use of her right hand, which restricted her ability to work as a dealer. (Id. ¶ 6.) Defendants point out that Plaintiff testified that her doctors said she could return to work without restrictions. (Taliaferro Dep. [Docket Item 91-4] at 20:10-15.) Defendants also produce Dr. Arvind Patel's "Modified Duty Job Evaluation" form, dated April 6, 2010, which indicates "NO RESTRICTIONS" for Plaintiff. (Ex. 1 [Docket Item 91-4].) However, Defendants also note that according to Gary Farland,

her employer with a note from her doctor's office[4] stating that Plaintiff could not perform any movements other than those involved in dealing three-card poker and blackjack. (Id. ¶ 9.) Specifically, Plaintiff testified that she could not deal roulette or other "carnival" games that involved tiles, small chips or quarters, which were difficult for her to manipulate, but that she could deal poker and blackjack. (Taliaferro Dep. at 58:20-60:23.) Plaintiff's supervisor informally accommodated her limitations by permitting her to switch assignments if she were assigned to a game she could not deal. (Id. ¶ 11; Def. Responsive Statement of Undisputed Material Facts ("Def. RSMF") ¶ 13; Def. SMF ¶¶ 26-27.) Plaintiff was permitted to deal blackjack or poker but not other games. (Def. SMF ¶ 32.) On occasion, if there were no games for Plaintiff to deal, she would be sent home. (Def. SMF ¶ 26.) Other times, Plaintiff "couldn't deal," so she would cede her day "to a part-timer just to deal as less as I could and try to keep my insurance and benefits paid." (Def. SMF ¶ 33; Taliaferro Dep. at 66:16-19.) After some time, human resources officially reviewed Plaintiff's requests for accommodations. (Def. SMF ¶ 29.) Plaintiff admits that Defendants accommodated her until

Trump's casino administrator and shift manager, Plaintiff was restricted when she returned to work to deal blackjack or three-card poker or games that are almost identical. (Def. SMF ¶ 32.)

[4] Plaintiff refers to the author of the note as "Dr. Lassley." (SMF ¶ 9.) Defendants contend that Lassley is a physician's assistant, not a doctor. (Def. RSMF ¶ 9.)

March 2011. (Def. SMF ¶ 30.)

The parties disagree whether Plaintiff's condition worsened between May 2010 and March 2011. Plaintiff testified that her ability to deal did not change during that period. (Taliaferro Dep. at 60:24-61:3.) Defendants point to letters from Dr. John Park of South Jersey Spine & Pain Physicians, the doctor provided by Defendants' workers' compensation carrier, which arguably indicate Plaintiff's deterioration. (Def. RSMF ¶ 16.) On January 15, 2011, Plaintiff received a performance evaluation, which stated that she was performing at a satisfactory level. (SMF ¶ 14; Ex. E to Pl. Ex C.)

On November 22, 2010, Dr. Park evaluated Plaintiff and wrote that "she is having a hard time at work. Patient reports that she is able to continue to work on black[jack] table and 3 card poker table. . . . She can pick up chips but cannot pick up Dollar coins." (Pl. Ex. I.) Plaintiff had asked Dr. Park to write a letter for her stating she could not work certain games, but he felt conflicted.

> I think her request makes some sense. Given her pain, she has [an] easier time picking up the larger chips than the smaller coins. On the other hand, I do not know enough about her jobs. I do not have intimate knowledge of exactly what a dealer has to do for each game.

(Id.) Dr. Park suggested that Plaintiff provide him with a job description for each game, at which time he would evaluate "whether she can do certain duties in the job descriptions." (Id.)

On January 21, 2011, Claudia Weinberg, Defendants' workers'

compensation insurance adjuster, wrote to Dr. Park, attaching the ADA

Job Description for a casino dealer. (Def. Ex. 31.) The "essential

job duties" are listed as

> 1. Responsible for dealing assigned game in accordance with
> CCC regulations and procedures.
> 2. May perform duties as stickperson when required.
> 3. Promotes positive guests regulations using cordial
> conversation as related to assigned games.
> 4. Performs other related duties as assigned.

(Def. Ex. 31.) Essential physical functions include "finger

dexterity" and "full use of both hands." (Id.) The description did

not distinguish the demands of dealing one game versus another.

On February 7, 2011, Dr. Park responded to Ms. Weinberg:

> As far as [Plaintiff's] job is concerned, I am not sure that
> she is able to continue to work as a dealer.
>     I believe her right upper extremity is essentially
> useless in terms of any employment is concerned. She has
> a lot of pain and limitations regarding her right upper
> extremity. I believe she is able to use her right upper
> extremity to some degree but cannot perform any job duties
> that require dexterity and ongoing use of the right upper
> extremity.
>     The patient had certain opinions about what type of
> games she can deal. As I stated to you in the past, I do
> not know enough about casinos and gambling to provide a
> medical opinion as to what type of games she can deal. So
> far, I have not received any information about what a dealer
> has to do in one particular games [sic] as compared to
> another.

(Pl. Ex. I.)[5]

---

[5] Plaintiff contests that Dr. Park ever received the ADA description
because he states in his letter he did not receive information
distinguishing one game from another. However, the ADA description
does not distinguish among games, and thus Dr. Park's statement does

On March 7, 2011, Dr. Park examined Plaintiff again. In his notes, he repeated opinions about the functionality of her right upper extremity, her dexterity, and pain and added:

> The patient had been asking that her employment provide her with flexibility in choosing the games that she feels comfortable dealing. I don't think this will likely happen. In the end, I think it is reasonable to conclude that she cannot continue to work as a dealer. I suggested that she look for a new employment that does not require dexterity of the right upper extremity.

(Def. Ex. 10 [Docket Item 91-5].) Three days later, Dr. Park sent another letter to Defendants in response to a request about confirming Plaintiff's work status. He stated:

> I had written a letter to Ms. Claudia Weinberg on February 7, 2011 expressing my opinion. In addition, I have also discussed my opinion regarding the work status in my dictation on March 7, 2011. My opinion regarding the work status has not changed.
>
> I don't think she is able to work as a dealer given her present symptoms. I don't think she is totally disabled. I think she is able to work in a sedentary type of a job that does not involve use of right upper extremity except for occasional use. There is no limitation in terms of use of the left upper extremity, or both lower extremities.
>
> If I change my opinion regarding her job status, I will notify all parties in writing. Please consider this letter and the letter that I wrote on February 7, 2011 as my opinion on the work status.

(Pl. Ex. I.)

### ii. Plaintiff's "reassignment" process

On March 11, 2011, Barbara Hulsizer, Trump Plaza's director of

---

not necessarily mean that he did not receive the ADA description.

employee relations/diversity, wrote a letter to Plaintiff with the subject line: "Re: Position Reassignment." (Def. Ex. 13.)

> Dear Arline:
>     We are in receipt of documentation from South Jersey Spine and Pain Physicians which states that you are unable to perform the essential functions of the Dealers position.
>     As such, effective immediately, you are being placed on reassignment. It is incumbent upon you to contact Debbie Martone, HR Talent & Development Manager at [phone number omitted], so that she can assist you with the reassignment process. The deadline for reassignment will be 30 days from March 11, 2011.

(Id.)

Plaintiff refers to this moment as her termination: "Barbara Hulsizer terminated Plaintiff's employment as a dealer based solely on her belief that Ms. Taliaferro 'cannot perform the essential functions of her position.'" (SMF ¶ 21.) Plaintiff asserts that Ms. Hulsizer's belief, in turn, was "based solely and exclusively on Dr. Park's March 10, 2011 letter." (Id. ¶ 22.) Defendants, by contrast, contend that Plaintiff was officially terminated in May 2011 after accumulating several unexcused absences and that this March employment action was the start of a "reassignment" process by which Plaintiff had 30 days to secure another position with Trump or else she would be terminated. (Def. RSMF ¶ 21.)

On March 17, 2011, after Plaintiff received Ms. Hulsizer's letter, Plaintiff met with Debbie Martone, human resources talent manager for Trump. (SMF ¶ 25; Def. Ex. 17 [Docket Item 91-6].)

9

According to Ms. Martone, the two discussed four positions -- accounts receivable supervisor, laundry linen attendant, parking cashier, and surveillance officer -- but Plaintiff expressed interest only in the accounts receivable and surveillance supervisory positions, for which Plaintiff was not qualified or eligible by way of Trump policy, which Plaintiff does not challenge. (SMF ¶ 25; Def. SMF ¶ 66; Martone Dep. [Def. Ex. 32] at 9:25-10:25.) Ms. Martone testified that she asked Plaintiff to let her know what Plaintiff wanted to do, but Plaintiff "never reached back out to me." (Martone Dep. at 13:1-10.) According to Plaintiff, Ms. Martone told her that nothing was available and to speak again with Ms. Hulsizer, whom Plaintiff contacted but who "never got back" to her. (Pl. Response to Def. SMF ¶ 65-68.) Plaintiff states that Martone never discussed the laundry attendant or cashier positions with her. (Id.)

Plaintiff did not secure another position within 30 days but does not claim that she was terminated in April. (Def. SMF ¶ 71.) At the end of April, after Plaintiff expressed interest in returning as a dealer with the same accommodations she had been afforded in the past, Hulsizer told Plaintiff she could return to work on May 6, as a dealer. (Id. ¶ 77.) Although Plaintiff's proposed start date changed a few times and there was confusion about what games Plaintiff would be

asked to deal upon her return,[6] ultimately Defendants expected Plaintiff to return to work in early- to mid-May, but Plaintiff never returned to work. (Def. SMF ¶¶ 91, 101-103.) On May 11, Defendants scheduled Plaintiff to work, and Plaintiff went to the property in her work clothes but saw she was scheduled to deal a style of blackjack she could not deal, and she ultimately did not report to work that day. (Def SMF ¶¶ 94-101; Taliaferro Dep. at 73:11-74:1.)

Defendants contend that Plaintiff took an unauthorized vacation to St. Louis in mid-May which did not correspond to the dates previously authorized for her vacation. Plaintiff was terminated on May 27, 2011, for missing work, about which Plaintiff had been warned previously.[7] (Def. SMF ¶¶ 93, 103-109; see also Def. Ex. 40

---

[6] William Hildebrand, Esq., representing Plaintiff at the time, wrote a letter to Ms. Hulsizer to clarify the date and to state that "her doctor has restricted her to dealing three-card poker and Blackjack. Nevertheless, your letter suggests she will be required to deal 'all variations of Poker.' I would appreciate clarification as to whether you will be asking her to exceed her physician-imposed restrictions." (Def. Ex. 38.)

[7] The parties disagree about the relevance of any developments after March 2011. Plaintiff underscores that "she is seeking damages as a result of the termination of her employment as a dealer at the Trump Plaza Casino in March, 2011." (Pl. Opp'n at 1.) Plaintiff states she "seeks judgment on liability only. Any claimed reinstatement [in May 2011] could be relevant to damages, but not liability. Therefore, Defendants' focus on events in May, 2011 is misplaced and does not bar a finding of liability for actions which occurred two months earlier." (Id. at 2.) Defendants maintain that Plaintiff was terminated only once, in May 2011, and that she was place on "reassignment" in March 2011. (Def. SMF ¶ 21.) Defendants do admit that Plaintiff requested and received unemployment benefits between

(disciplinary action notice for seven unexcused absences within the past year, dated January 12, 2011); Def. Ex. 42 (Plaintiff's attendance record).)

Between March 11, 2011, and May 27, 2011, the time during which Plaintiff contends she was terminated, reinstated and terminated again, Plaintiff applied for unemployment benefits, which she received. (Def. SMF ¶ 69; Def. Ex. 33.) Plaintiff contends she received benefits because she "had been suspended from her job as a dealer." (Pl. Response to Def. SMF ¶ 69.) Defendants note Plaintiff's unemployment form states the "Reason for Separation" as "Lack of Work." (Def. Ex. 33.) Defendants did not initially contest Plaintiff's claim for unemployment benefits, but Defendants deny that this is evidence that reassignment was, in fact, a termination, because "Trump merely was following its policy of not objecting to employees' applications for Unemployment Compensation when there is no work as a means of assisting employees when the casino is not busy." (Def. Reply [Docket Item 123] at 8 n.5.)

In addition, after March 11, Plaintiff remained on active employment status and received vacation pay for the days of March 12 & 13 and May 16, 17, 18, 19 & 20, and sick pay for March 11, and May 11 & 12 (Hildebrand Aff. Ex. A [Docket Item 122-1]).[8] Plaintiff

_____

March 2011 and May 2011. (Def. SMF ¶ 69.)

[8] Plaintiff contends that if she remained on active employment

continued to be covered by her employer's benefits during this period,
too. Defendants assert that, in April, Plaintiff corresponded with
HR about her medical benefit contribution. (Clark Aff. Ex. J [Docket
Item 121-5]; Ex. G (Lloyd Dep.) [Docket Item 121-5] at 60:8-20; Ex.
H (Taliaferro Dep. II) at 175:20-176:2); (Hildebrand Aff. Ex. A
[Docket Item 122-1]). Plaintiff denies she had this correspondence.
Her medical benefits were terminated on May 5, 2011 (made retroactive
to March 13, 2011), because she had failed to make premium payments
for several weeks. (Def. SMF [Docket Item 121-2] ¶¶ 24-26); Pl. Resp.
to SMF [Docket Item 122-2] ¶¶ 24-26]) (admitted in relevant part).[9]

On April 26, 2012, Plaintiff settled her workers' compensation

---

status, Defendants made a bookkeeping error.

[9] Plaintiff admits that, as of May 3, 2011, she had not made a payment
on her benefits in seven weeks and that the benefits were not
terminated until May 5, 2011, retroactive to the date she last made
a payroll deduction for her portion of the premium for her benefits.
(Def. SMF ¶¶ 24, 26; Pl. Resp. to SMF ¶¶ 24, 26.) Defendants assert
that on May 5, 2011, "while Plaintiff was still on active employment
status with Trump Plaza, she was provided notice that her benefits
were being terminated effective March 13, 2011." (Def. SMF ¶ 25.)
Plaintiff admits this assertion in part and denies in part, stating:

> If, in fact, Ms. Taliaferro was still 'on active employment
> status' as of this date, this was a mistake by the payroll
> department, because he [sic] employment terminated as of
> March 11, 2011, and she was not being paid. Furthermore,
> as previously stated, her 'payroll status' is irrelevant
> to her entitlement to COBRA benefits, which depends on the
> date her employment terminated.

(Pl. Resp. to SMF ¶ 25.) Thus, she appears to concede that she received
notice in May that her benefits were being terminated retroactively.

claim with Defendants for $148,500, agreeing that she suffered a 50 percent partial permanent disability. (SMF ¶ 26; Def. SMF ¶ 114.)

### iii. Social Security Disability Insurance

On December 31, 2011, Plaintiff completed a "Function Report" as part of her application for Social Security Disability Insurance benefits ("SSDI") from the Social Security Administration ("SSA"). The forms required Plaintiff to provide details about her life and functional capacity, the activities she was capable of performing, and how her disability affected her ability to work. In applying for SSDI, Plaintiff claimed that she was disabled, unable to perform her past relevant work and that no occupations existed in significant numbers in the national economy that Plaintiff could perform. See 20 C.F.R. §§ 404.1520(a) & 404.1560(b) (setting forth the requirements for eligibility for SSDI and determining whether the claimant has the functional capacity to perform work that "exists in significant numbers in the national economy").

Plaintiff made several factual assertions in her SSDI submission about her hand. She twice stated, unequivocally, that "I cannot use my right hand." (Def. Ex. 48 at SSA000245, SSA000248.) She also stated that she "cannot open can goods, lift pots/pans, and unscrew bottles, etc." (id. at SSA000245); that she does "not do household chores because of difficulties with dominant hand" (id. at SSA000246); that it is "difficult to complete the task [house or yard work] with one

14

hand. I use my left hand as much as possible" (id.); that she has "limited use of one hand" (id. at SSA000247); that she "cannot use my right hand to write" (id.); that "it is difficult to separate dollars and difficult to pick up change" (id.); that she "can only basically use left hand" (id. at SSA000249); and that she "need[s] help in completing any task requiring use of my right hand. I can not [sic] do 80% of my life because of this injury" (id. at SSA000251). She also noted that she was taking medication that "causes me to sleep most of the day," and which causes nausea and affects her "mental state," including her memory and her ability to concentrate. (Id. at SSA000244-45, SSA000249.)

According to the "Disability Report - Adult - Form SSA-3368," Plaintiff alleged a disability onset date of March 11, 2011. (Def. Ex. 46 at SSA000010-11.) She claimed that March 11, 2011, was the date she "stopped working," and she stopped working "[b]ecause of my condition(s)." (Id. at SSA000011.) She identified four physical or mental conditions that limited her ability to work: (1) "Permanent nerve damage of the right forearm and hand"; (2) "Reflex Sympathetic Dystrophy"; (3) "High blood pressure"; and (4) "Adjustment disorder with anxiety and depressed mood." (Id.)

On January 12, 2012, an SSA disability adjudicator/examiner reviewed Plaintiff's case and determined that Plaintiff was disabled. In the adjudicator's report, under a heading "Findings of Fact and

Analysis of Evidence," the adjudicator noted: "cannot use right hand" and "complex regional pain syndrome about the right wrist hand and forearm is 45 percent permanent/partial disability." (Def. Ex. 48 at SSA000255.) The adjudicator also noted that Plaintiff's range of motion is "limited" and that she has "perminate [sic] damage on elbow and hand." (Id.) When discussing Plaintiff's Residual Functional Capacity ("RFC"), the adjudicator wrote:

> Claimant injured at work in a fall. Claimant fxd [fractured] her Rt wrist and required ORIF [open reduction and internal fixation]. Following the surgery the claimant developed pain and discomfort, and studies [a 3 phase Bone scan] suggested the presence of RSD. <u>Since the injury the claimant has been unable to use her Rt hand or wrist</u>. Claimant is on significant pain meds [neurotonin, percocet, Exalog] 10/31/11 exam showed marked allodynia, swelling of her hand dorsally, coolldness [sic] of fingers and early contraction of the Rt hand though the fingers could be passively opened. Claimant uses a brace & splint.

 (Id. at SSA000256-57) (emphasis added). The adjudicator also noted that Plaintiff had limited "handling" and "fingering" abilities (gross and fine manipulation) and limited feeling (skin receptors) in her right hand. (Id. at SSA000257.) In explaining Plaintiff's "postural limitations," the adjudicator wrote, "See inability to use her Rt hand or wrist." (Id.) The adjudicator noted Plaintiff's past relevant work as a casino dealer and as a ticket agent for an airline, before noting that she did not have the RFC to perform her past relevant work. (Id. at SSA000259.) The adjudicator concluded that Plaintiff was disabled. (Id.) Plaintiff began receiving SSDI in

January 2012. (Def. Ex. 48 at 1.)

**B. Procedural history**

Plaintiff filed suit in New Jersey Superior Court on May 12, 2011, alleging a single count under the LAD. [Docket Item 1, Ex. A.] Plaintiff later added a second count, alleging a violation of the ERISA, 29 U.S.C. § 1161. [Id. Ex. B ¶¶ 19-27.] Specifically, Plaintiff alleges that Defendants failed to provide her with COBRA notice of her right to elect continuation coverage under her health insurance plan upon termination. [Id. ¶¶ 23-24.] Defendants removed the action to this Court under 28 U.S.C. § 1441(a), as this Court has original jurisdiction over the ERISA claim under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a).

Plaintiff brought the present motion for partial summary judgment, concerning only the LAD count [Docket Item 65], and Defendants countered with a cross-motion for partial summary judgment [Docket Item 91]. Defendants have moved for partial summary judgment on the ERISA count, too. [Docket Item 121.] The Court heard oral argument on October 28, 2013.

**III. Standard of review**

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A dispute is "genuine" if, based on the evidence in the record, a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is "material" if it might affect the outcome of the suit. <u>Id.</u> The court will view evidence in the light most favorable to the non-moving party and "all justifiable inferences are to be drawn in [that party's] favor." <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999). Fed. R. Civ. P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Marten v. Godwin</u>, 499 F.3d 290, 295 (3d Cir. 2007) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986)).

When ruling on cross-motions for summary judgment, the court "must consider the motions independently . . . and view the evidence on each motion in the light most favorable to the party opposing the motion." <u>United States v. Kramer</u>, 644 F. Supp. 2d 479, 488 (D.N.J. 2008) (citing <u>Williams v. Philadelphia Housing Auth.</u>, 834 F. Supp. 794, 797 (E.D. Pa. 1993), <u>aff'd</u>, 27 F.3d 560 (3d Cir. 1994), and <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 547, 587 (1986)).

**IV. Discussion**

    **A. New Jersey Law Against Discrimination claim (Count I) and**

**Judicial Estoppel through Plaintiff's Claims of Total
Disability before the Social Security Administration**

The LAD offers broad protections against discrimination for
those who are or were disabled or perceived to be disabled. <u>Victor
v. State</u>, 203 N.J. 383, 410 n.11 (2010). The LAD states:

> All of the provisions of the act to which this act is a
> supplement shall be construed to prohibit any unlawful
> discrimination against any person because such person is
> or has been at any time disabled or any unlawful employment
> practice against such person, unless the nature and extent
> of the disability reasonably precludes the performance of
> the particular employment.

N.J.S.A. § 10:5-4.1. The statute also provides:

> Unless it can be clearly shown that a person's disability
> would prevent such person from performing a particular job,
> it is an unlawful employment practice to deny to an
> otherwise qualified person with a disability the
> opportunity to obtain or maintain employment, or to advance
> in position in his job, solely because such person is a
> person with a disability . . . .

N.J.S.A. § 10:5-29.1.

Plaintiff contends it is her burden to prove a prima facie case
of discrimination by showing (1) she was disabled, (2) she was
qualified to perform the essential functions of her employment, and
(3) she suffered an adverse employment action. (Pl. Mot. Br. at 8-9,
citing <u>Victor v. State of N.J.</u>, 401 N.J. Super. 596, 614 (App. Div.
2008)). Plaintiff contends that to meet the second prong of the prima
facie test, "'[a]ll that is necessary is that the plaintiff produce
evidence showing she was <u>actually</u> <u>performing</u> <u>the</u> <u>job</u> prior to the

termination. . . . That is not a heavy burden, nor was it meant to be.'" (Pl. Reply at 3, quoting <u>Zive v. Stanley Roberts, Inc.</u>, 182 N.J. 436, 454-55 (2005)) (Plaintiff's emphasis).

Defendants argue that Plaintiff is estopped from arguing that she was qualified to perform the essential functions of her job as of March 11, 2011, based on her representations to the SSA that, as of March 11, 2011, she was disabled and unable to perform any work that exists in significant numbers in the national economy. (Def. Cross-Mot. at 14-21.) Namely, Plaintiff made unequivocal statements that she was unable to use her right hand and wrist, and the SSA adjudicator accepted those representations and relied upon them to determine that she was disabled.

The legal standard for a determination that a claimant is disabled under the Social Security Act is an exacting one, requiring proof of inability to perform past relevant work (here, the Plaintiff's physical inability to perform her casino dealer job) and the inability to perform <u>any</u> substantial gainful employment considering her age, education and work experience.

Under the Social Security Act, a "disability" is defined, for purpose of a claimant's entitlement to benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 1382c(a)(3)(A); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (citations omitted). A claimant is considered unable to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

Plaintiff responds that she is not estopped. She argues that simply because a person may qualify for disability under the SSA's administrative rules does not mean that she is incapable of performing the essential functions of his or her job. (Pl. Opp'n at 13-14, citing Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 797-98 (1999)). Plaintiff then cites a state-law case in further support of her position, Ramer v. N.J. Transit Bus Operations, Inc., 335 N.J. Super. 304 (App. Div. 2000), and faults Defendants for ignoring "controlling precedent, relying instead on federal cases and unreported decisions which are not binding on this state law claim." (Pl. Opp'n at 14 n.1.) In Ramer, the court held that judicial estoppel did not bar the plaintiff's claim on summary judgment, because the plaintiff's previous inconsistent statements made in pursuit of private credit disability insurance -- not SSDI -- were not made in a judicial or quasi-judicial proceeding. (Pl. Opp'n at 15, citing Ramer, 335 N.J.

Super. at 312.) The court continued:

> Plaintiff's statements of disability on the insurance
> forms were no more than that she was totally disabled from
> performing her job based upon the N.J. Transit doctors'
> determination that she was so disabled. This was true. But
> the total disability determination of the doctors' was, at
> least according to her, based upon the fifty-percent
> disabled policy. A claim for insurance benefits based upon
> that disability assessment is not irreconcilably
> inconsistent with plaintiff's LAD claim that at the time
> she was fired she could perform her job, if even with
> reasonable accommodations. It is for a jury to consider
> whether plaintiff's prior statements of disability in
> connection with her insurance claim and whatever may be her
> trial testimony as to her ability to perform the functions
> of a bus operator during that same time period are
> inconsistent and, if so, what weight to give to that
> inconsistency. We do not believe that, as a matter of law,
> the insurance claim statements warrant a bar to plaintiff's
> LAD complaint.

Ramer, 335 N.J. Super. at 318-19.

As an initial matter, Plaintiff is incorrect that New Jersey law
is controlling on this point. The Third Circuit has held that in
diversity cases, federal courts should apply federal judicial
estoppel law. G-I Holdings, Inc. v. Reliance Ins. Co., 586 F.3d 247,
261 (3d Cir. 2009) (joining at least five other U.S. Courts of Appeals
in holding that a "'federal court's ability to protect itself from
manipulation by litigants should not vary according to law of the
state in which the underlying dispute arose,'" and applying federal
judicial estoppel law to state-law claims) (quoting Ryan Operations
G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 n.2 (3d Cir.
1996)). Here, because Plaintiff's discrimination claim arises under

state law, the G-I Holdings rule applies to this claim, and the Court

will not find New Jersey case law controlling for the estoppel

analysis.[10]

In Cleveland, the U.S. Supreme Court set forth the estoppel

framework for this kind of claim. The Court considered the case of

a plaintiff who brought an ADA claim despite the fact that she had

applied for, and received, SSDI benefits. Cleveland, 526 U.S. at 798.

The Court held that the

> pursuit, and receipt, of SSDI benefits does not
> automatically estop the recipient from pursuing an ADA
> claim. . . . Nevertheless, an ADA plaintiff cannot simply
> ignore her SSDI contention that she was too disabled to
> work. To survive a motion for summary judgment, she must
> explain why that SSDI contention is consistent with her ADA
> claim that she could 'perform the essential functions' of
> her previous job, at least with 'reasonable
> accommodation.'

Id. (emphasis added). In other words, the plaintiff's "explanation

---

[10]    Even if the Court would apply state judicial estoppel law, the
result in Ramer is not necessarily compelled here. A 50-percent
disability threshold relevant to the private insurance policy at
issue in Ramer is vastly different from the stringent SSDI standard
of total disability and is much more easily harmonized with
representations that a plaintiff is capable of performing essential
duties of his or her job.
    Plaintiff further argues that estoppel cannot apply "because
Plaintiff's allegedly inconsistent statements were not made in the
context of a prior judicial proceeding." (Pl. Opp'n at 16.) This
argument is without merit. Not only is the SSDI review process
properly considered quasi-judicial -- it involves claims seeking
relief, evidence of record, and "findings of fact and analysis of
evidence" by a "disability adjudicator/examiner" who ultimately
makes a determination based on the evidence -- but all other Third
Circuit decisions which apply estoppel based on representations to
the SSA implicitly reject Plaintiff's argument in this context.

must be sufficient to warrant a reasonable juror's concluding that,

assuming the truth of, or the plaintiff's good-faith belief in, the

earlier statement, the plaintiff could nonetheless 'perform the

essential functions' of her job, with or without 'reasonable

accommodation.'" Id. at 807.

Cleveland precludes a categorical finding of judicial estoppel

but does not bar the application of the doctrine after an

individualized inquiry. The Third Circuit recently elaborated on the

Cleveland holding:

> Explanations of the sort Cleveland requires are, in short,
> contextual -- they resolve the seeming discrepancy between
> a claim of disability and a later claim of entitlement to
> work not by contradicting what the plaintiff told the
> [benefits provider], but by demonstrating that those
> representations, understood in light of the unique focus
> and requirements of the [benefits provider] leave room for
> the possibility that the plaintiff is able to meet the
> essential demands of the job to which he claims a right
> under the ADA.

Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 273 (3d. Cir. 2012) (quoting

Detz v. Greiner Indus., Inc., 346 F.3d 109, 118 (3d Cir. 2003)).

In the Third Circuit, courts apply a "Cleveland analysis,"

rather than the traditional three-step judicial estoppel analysis,[11]

---

[11] The traditional judicial estoppel analysis in the Third Circuit
requires a showing of "'(1) irreconcilably inconsistent positions;
(2) adopted in bad faith; and (3) a showing that estoppel addresses
the harm and no lesser sanction is sufficient.'" MD Mall Assocs. v.
CSX Transp. Inc., 715 F.3d 479, 486 (3d Cir. 2013) (quoting G-I
Holdings, 586 F.3d at 262). This case, by contrast, involves
"context-related legal conclusions" of whether Plaintiff was

"in the context of a summary judgment motion where, as here, the claimant clearly made a contradictory assertion after benefitting from a previous sworn assertion, the court or agency thus having accepted the previous assertion." Detz, 346 F.3d at 117-18 (citing Motley v. N.J. State Police, 196 F.3d 160, 164-66 (3d Cir. 1999)).[12] When conducting a Cleveland analysis, a court must ask (1) whether the positions taken by the plaintiff in her SSDI application and her discrimination claim genuinely conflict and (2) whether the plaintiff has adequately reconciled the two positions. Id. at 118, 120. In reconciling the two positions, the plaintiff "must proceed from the premise that his previous assertion of an inability to work was true, or that he in good faith believed it to be true," and nonetheless demonstrate that the prior representations are "consistent with his ability to perform the essential functions of his job." Id. at 118 (quoting Lee v. City of Salem, 259 F.3d 667, 674-75 (7th Cir. 2001)).

---

disabled for purposes of SSDI and whether she was objectively qualified to perform essential duties of her job, bringing this case within the holding of Cleveland. See Detz, 346 F.3d at 116.

[12] In Detz, the Third Circuit held that a plaintiff's statements in his application for SSDI benefits precluded him from later bringing an age discrimination claim, which necessarily required him to assert that he was fully qualified for the position from which he was discharged. Detz, 346 F.3d at 114, 121.

Here, Plaintiff's positions genuinely conflict. By statute and under related regulations, to be eligible for SSDI an applicant must be incapable of performing her "past relevant work" or any other job existing in significant numbers in the national economy. See 42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 404.1560(b)-(c); Detz, 346 F.3d at 119. In support of her application, Plaintiff averred that "I cannot use my right hand" and "I cannot use right hand." (Def. Ex. 48 at SSA000245, SSA000248.) She swore that she needed help "completing any task requiring use of my right hand." (Id. at SSA000251.) She further detailed all of the daily activities and chores she could not perform because of problems with her dominant hand. (Id. at SSA000245-49.) The SSA relied upon these representations and found that "[s]ince the injury the claimant has been unable to use her Rt hand or wrist," and that she does not have the residual functional capacity to perform her past relevant work. (Def. Ex. SSA000256, SSA000259.) In other words, the SSA found she was unable to work in her casino dealer job as of March 11, 2011.

Now, Plaintiff argues that she "was clearly objectively qualified to perform her job, but precluded from performing it, solely on account of her disability." (Pl. Mot. Br. at 11.) Her current litigation position is that, as of March 11, 2011, the alleged onset date of her disability for SSDI purposes, not only could she use her

right hand but that she had the dexterity to deal certain types of blackjack and poker. There is no indication in the record that Plaintiff's submission to the SSA included any statements consistent with her present position that she was capable of dealing certain card games for gainful employment, and necessarily the SSA determined that she was not. Rather, Plaintiff's statements to the SSA clearly stated that she was unable to use her right hand for "any task." (Id. at SSA000251.)

Plaintiff's statements to the SSA about the reason for her ceasing employment on March 11, 2011, also present a genuine conflict with her claim in this case that she was wrongfully terminated. Plaintiff asserted that she stopped working on March 11, 2011, "[b]ecause of my condition(s)." (Def. Ex. 46 at SSA000011.) Thus, Plaintiff represented to the SSA that her disability caused her to stop work in March. Now, Plaintiff claims that she stopped working because she was illegally terminated, and that her physical limitations had nothing to do with her ability to perform the essential duties of her job.[13]

_____

[13] These assertions are similar to those made by the plaintiff in Detz and which the Third Circuit found were grounds for estoppel. The plaintiff in Detz argued that

> he became 'disabled' for SSDI purposes, by virtue of his discharge by [his employer]. Before that, he was not 'disabled,' as he had a job in the Tool Room and could perform that job. After that, he was 'disabled,' because

Like the plaintiff's positions in <u>Detz</u>, Plaintiff's positions here can be summarized as follows:

> [She] informed the SSA in a sworn statement that [her] disability prevented [her] from working - in other words, that [she] was physically <u>incapable</u> of performing [her] job. Now [she] seeks to advance a position before this Court that rests on the assertion that [she] was discharged from a position that [she] was physically <u>capable</u> of performing. This second position "crashes face first against" [her] prior claim. <u>Feldman[ v. Am. Mem'l Life Ins. Co.</u>, 196 F.3d 783, 791 (7th Cir. 1999)]. Thus, we are compelled to find that [her] two assertions are "patently inconsistent," <u>Motley</u>, 196 F.3d at 167[.]

<u>Detz</u>, 436 F.3d at 119-20. Accordingly, the Court finds that Plaintiff's positions advanced before, and representations made to, the SSA and this Court genuinely conflict.

Next, Plaintiff must adequately reconcile the two positions. She advances two theories to harmonize her positions:

---

he was no longer allowed to continue performing <u>that</u> job, and he would not be able to find another job similarly tailored to his physical limitations.

<u>Detz</u>, 346 F.3d at 114.

the statements were made at a later time, and are easily
explained by the fact that at the time of her application
for disability benefits, Dr. Park changed her medication
to include Exaglo (a drug containing Morphine). Therefore
the doctrine of judicial estoppel does not bar her claim.

(Pl. Opp'n at 16-17.)

The passage-of-time argument is unavailing. Plaintiff argues
that her "application for SSDI benefits several months later is not
inconsistent with her claim that she was capable of working in March."
(Id. at 5.) However, Plaintiff's alleged onset date of disability,
for SSDI purposes, is March 11, 2011, the date that she received a
letter placing her on "reassignment." (See Def. Ex. 46 at SSA000007.)
She also asserted that her "condition(s)" caused her to stop working
on March 11, 2011 -- not her termination. (Id. at SSA000011.) Thus,
her position before the SSA was that she was disabled and unable to
work as a result of her disability as of March 11, 2011. The fact that
her statements were made several months after her discharge does not
reconcile Plaintiff's statements that (1) she was unable to use her
right hand to perform tasks versus that she could use her right hand
to deal, or (2) that she stopped working because of her conditions
versus that she stopped working because she was terminated. Plaintiff
adduces no evidence that Plaintiff's hand or wrist condition
deteriorated between March and when she submitted her application for
SSDI in December 2011. Plaintiff's passage-of-time explanation does
not permit a reasonable juror, assuming the truth of, or the

plaintiff's good-faith belief in, her earlier statements, to conclude that plaintiff could perform the essential functions of her job or that she stopped working on March 11 because she was terminated. Id. at 807.

Next, Plaintiff suggests that the finding of disability was made after she began taking heavy pain medication, which does not necessarily contradict that she was able to work before she began taking the medicine. However, the SSA adjudicator noted without qualification that "[s]ince the injury the claimant has been unable to use her Rt hand or wrist." (Def. Ex. 48 at SSA000256.) Thus, the SSA apparently accepted Plaintiff's stated position that her disability in her hand and wrist was debilitating. The SSA necessarily and explicitly found, in accordance with Plaintiff's statements, that she was unable to perform her job as of March 11, 2011, two months before she began the drug regimen, and the SSA awarded disability benefits based on that fact. Therefore, it is logically not possible that her medication was determinative in finding her disabled.

For estoppel purposes, the key is not simply what the SSA determined, but what representations Plaintiff made to the SSA, which the SSA accepted. None of Plaintiff's own assertions about her right hand appear to be related to whether Plaintiff was or is on pain medication, so the fact that Plaintiff began her pain medication regimen after her reassignment, or that the SSDI application was

"prompted by Dr. Park's prescription," as Plaintiff now argues, does not explain her contradictory representations. (See Pl. Opp'n at 5, 16.) In addition, Plaintiff stated that she stopped working because of her conditions on March 11, 2011, before she was taking the pain medication. Plaintiff makes no attempt to explain how pain medication she began taking in May caused physical conditions that forced her to stop working in March.

It is Plaintiff's burden to reconcile her statements to the SSA and this Court. Cleveland, 526 U.S. at 798; Detz, 346 F.3d at 118, 120. Her two explanations do not adequately harmonize her contradictory positions. On this record, the Court must find that Plaintiff is estopped from asserting that she was qualified to perform her job as of March 11, 2011 -- which is a necessary element of her LAD claim -- in contradiction of her previous statements that she could not use her right hand and that she stopped working because of her conditions on March 11, 2011. Plaintiff has advanced no reasonable explanation that reconciles her two positions. Plaintiff cannot simply disavow her prior sworn representations upon which the Government relied in finding she was unable to perform her past relevant work as a casino dealer as well as any gainful employment as of March 11, 2011. She benefitted from her statements, the SSA relied on them, and she is estopped from taking a contrary position now. Defendants' motion for summary judgment is granted on

Plaintiff's LAD claim, and Plaintiff's motion for summary judgment on Count I is denied.

## B. ERISA claim ("Count II")

Count II alleges that 29 U.S.C. § 1161 "requires the plan sponsor for every group health plan to notify each qualified beneficiary of their right to elect continuation coverage under the plan in the event of a qualifying event such as the termination of a covered employee's employment." (Am. Compl. ¶ 23.) Defendants argue that Plaintiff has no standing to sue for this COBRA violation and, even if she did, she lost her benefits for non-payment of premiums prior to her termination in May. (Def. Mot. Br. at 3-4, 8-9.) Plaintiff asserts that she has standing and that she was a participant in Defendants' ERISA-governed plan on March 11, 2011, the date of her termination, and therefore was entitled to notice under COBRA within 44 days of the termination of her employment. (Id. ¶ 24.) Plaintiff asserts that Defendants did not provide her with the required notice and are liable under ERISA § 502(c)(1) for a penalty of up to $110.00 per day for each day (in excess of 30 days) that the COBRA notice is late. (Id. ¶ 26.)

### i. COBRA and ERISA

COBRA, and accompanying regulations, provide that the administrator of a group health plan subject to the COBRA continuation coverage requirements shall provide notice to each qualified beneficiary of the rights to continuation coverage under the plan.

32

26 C.F.R. § 2590.606-4(a). A qualified beneficiary is an employee, or spouse or dependent of the employee, who on the day before the qualifying event is covered by the employer's group health plan. 26 C.F.R. § 54.4980B-3. A qualifying event is, among other things, the termination or reduction of hours of a covered employee's employment, provided that the termination "causes the covered employee . . . to lose coverage under the plan," and the plan is subject to COBRA. 26 C.F.R. § 54.4980B-4. The "loss of coverage need not occur immediately after the event, so long as the loss of coverage occurs before the end of the maximum coverage period." Id.

The statute provides: "The plan sponsor of each group health plan shall provide . . . that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan." 29 U.S.C. § 1161(a). COBRA requires the employer to inform the health plan's administrator of a covered employee's qualifying event within 30 days, see 29 U.S.C. § 1166(a)(2), and the administrator must furnish to the qualified beneficiary the required notice of the right to elect continuation coverage within 14 days of receipt of the notice of the qualifying event or within 44 days of the qualifying event. 29 C.F.R. 2590.606-4(b)(1)-(2); see also Fama v. Design Assistance Corp., Nos. 12-2414 & 12-2474, 2013 WL 1143463, at *1 (3d Cir. Apr. 10, 2013) (not

33

for publication). The statute and regulations provide for a penalty of up to $110 per day. 29 C.F.R. § 2575.502(c)-1 (adjusting upward the statutory penalty under 29 U.S.C. § 1132(c)(1)).

ERISA provides for the civil enforcement of the COBRA notice provision. 29 U.S.C. § 1132(a)-(c). Only participants, beneficiaries, fiduciaries and the Secretary of Labor may bring an action under § 1132. A "participant" is "any employee or former employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer . . . ." 29 U.S.C. § 1002(7). The U.S. Supreme Court has stated that the term "participant" means either "'employees in, or reasonably expected to be in, currently covered employment,' or former employees who 'have . . . a reasonable expectation of returning to covered employment' or who have 'a colorable claim' to vested benefits.'" Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 117 (1989) (internal citations omitted). The Court continued: "In order to establish that he or she 'may become eligible' for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." Id. at 117-18. "A former employee who has neither a reasonable expectation of returning to covered employment nor a colorable claim to vested benefits, however, simply does not fit within the [phrase] 'may become eligible.'" Id. at 118.

## ii. Standing

Defendants argue that Plaintiff lacks statutory standing because she was not a plan participant at the time this action was filed. (Def. Mot. Br. at 6; Reply at 3.) Plaintiff responds that she was a participant at the time of her termination, thus she has statutory standing.

The Court agrees with Plaintiff on standing. In Daniels v. Thomas & Betts Corp., 263 F.3d 66, 78 (3d Cir. 2001), the Third Circuit held that in a § 1132(a)(1)(A) suit for failure to provide information, a person need only have been a participant at the time of breach to have statutory standing. See also Graden v. Conexant Sys. Inc., 496 F.3d 291, 296 n.7 (3d Cir. 2007) (stating that there is "an open question in our Court as to when statutory standing must attach" for different ERISA claims, but citing Daniels and declining to rule further on the issue). Defendants have not presented a compelling argument for why the Daniels approach should not apply to this matter, nor why a suit for failure to provide COBRA notice must be brought by a current participant in an ERISA plan or by one with a colorable claim for benefits at the time of suit. Accepting Defendants' position likely would bar any former employee, who was without a reasonable expectation of returning to covered employment, from ever bringing suit for failure to provide COBRA notice. Therefore, if Plaintiff was a participant at the time of the qualifying event, she will have

standing to bring this claim.

### iii. Qualifying event

Defendants argue that neither of the alleged "terminations" of Plaintiff -- in March or May 2011 -- can be qualifying events because neither termination <u>caused</u> the loss of benefits as required by 26 C.F.R. § 54.4980B-4. According to Defendants, whether Plaintiff was terminated in March is not dispositive in this motion because Plaintiff admits that "Plaintiff's benefits were not terminated until May 5, 2011 . . . ." (Def. SMF ¶ 26; Pl. Resp. to SMF ¶ 26 ("Admitted").) It appears to be undisputed that the benefits were terminated for Plaintiff's failure to make payments to the benefits office.[14] (<u>Id.</u> ¶ 27; Clark Aff. Ex. J.) Therefore, the loss of coverage was independent of any other employment action, and non-payment of premiums is not a qualifying event triggering COBRA notice requirements. <u>See</u> <u>Jordan v. Tyson Foods, Inc.</u>, 257 F. App'x 972, 980 (6th Cir. 2007) (holding that losing coverage for non-payment of

---

[14] Plaintiff admits that the benefits were terminated on May 5. (Def. SMF ¶ 26; Pl. Resp. to SMF ¶ 26.) She also admits "she did not make any payments after March 13, 2011. Accordingly, on May 5, 2011, Defendant cancelled her benefits, retroactive to that date." (Pl. Resp. to SMF ¶ 23.) Plaintiff responds to Defendants' later assertion about non-payment with a denial, but she does not specifically deny that the benefits were terminated because of non-payment. Plaintiff states: "Plaintiff admits she never received a COBRA notice, notwithstanding the termination of her employment as a dealer on March 11, 2011. The reason for this is unclear. Plaintiff admits that she did not have active health benefits as of May 27, 2011. However, Plaintiff denies that this date has any significance whatsoever in connection with her COBRA claim." (Pl. Resp. to SMF ¶¶ 27-28.)

premiums is not a qualifying event).

Plaintiff argues that, under her plan's terms, coverage ends on the earliest of three dates: the date employment ends, the date she is no longer eligible to participate in the plan, or the date she fails to make the required contributions. (Pl. Opp'n at 1; Def. Ex. A at 9 [TT000735].) She claims that because her alleged termination in March 2011 predated her non-payment, her coverage ended upon her termination and thus her termination was a qualifying event. However, as discussed above, Plaintiff admitted that her coverage was terminated on May 5, retroactive to March 13, 2011. (Pl. Resp. to SMF ¶ 26.) In her response to Defendants' Rule 56.1 statement, Plaintiff asserts she "did not make any payments after March 13, 2011. Accordingly, on May 5, 2011, Defendant cancelled her benefits, retroactive to that date." (Pl. Resp. to Def. SMF ¶ 23) (emphasis added). These admissions lead to the conclusion that Plaintiff's termination of benefits was unrelated to any previous adverse employment action. Plaintiff has not established a qualifying event because she has not shown that a termination or a reduction in hours caused a loss of benefits. The loss of benefits admittedly occurred in May, retroactive to March, and Plaintiff does not establish causation of her adverse employment action and her loss of benefits.

Even setting aside Plaintiff's admission in her response to Defendants' Rule 56.1 statement, Plaintiff concedes that "[t]he issue

is whether the termination of her employment on March 11, 2011 constitutes a 'qualifying event,' entitling her to COBRA coverage. If it does not, the Plan Administrator is not liable, because, absent a 'qualifying event,' no COBRA notice is required." (Pl. Opp'n at 1.) At oral argument, Plaintiff's counsel reiterated that if the adverse employment action in March is not deemed a termination, her COBRA claim must fail. As explained below, the undisputed facts preclude a finding that Plaintiff was terminated in March 2011.

As Defendants argue, a "termination of employment" in New Jersey "hinges on the discontinuation of the employer-employee relationship." (Def. Mot. Br. at 13-14, citing <u>Novern v. John Hancock Mut. Life Ins. Co.</u>, 107 N.J. Super. 570, 575 (Law Div. 1969) ("In order to effect a discontinuance of the insurance, the termination of employment must be a clear and complete severance of the relationship of the employer and employee"); <u>In the Matter of Viviani</u>, 184 N.J. Super. 583, 589 (App. Div. 1982) (leave of absence not a termination); <u>Kowalski v. Travelers Ins. Co.</u>, 115 N.J. Super. 545, 547 (Law Div. 1971) (absence from work or leave of absence not a complete severance of the employer-employee relationship); and <u>Goelbelecker v. State</u>, 53 N.J. Super. 53, 58 (App. Div. 1958) (finding termination occurred when a plaintiff notified his employer that he refused to accept a transfer, not when the plaintiff was offered a transfer to another position).) Here, undisputed facts show that Plaintiff's

employer-employee relationship was not severed.

It is undisputed that Defendants always characterized the employment action as a "reassignment" and that Plaintiff received a letter from Ms. Hulsizer dated March 11, 2011, with the subject "Re: Position Reassignment." (Ex. F. to Pl. Ex. C, Pl.'s Request for Admissions.) Ms. Hulsizer wrote, "you are being placed on reassignment," and advised that she should contact Ms. Martone "so that she can assist you with the reassignment process. The deadline for reassignment will be 30 days from March 11, 2011." (Id.) Mr. Jack Feinberg, Esq., Plaintiff's workers' compensation lawyer, responded on March 16, 2011, by letter to Mr. James Paoli, Esq., representing Defendants, observing that Defendants intended to "reassign her" but had failed to provide her with work as of March 16. (Id.) Mr. Feinberg wrote: "In retaliation to Arline's filing this workers compensation case your client has seen fit to seek to reassign her which is clearly retaliatory." (Id.) Mr. Feinberg requested that Defendants accommodate Plaintiff by limiting her assignments to games she can deal, and "[a]bsent such reassignment I believe I will have no alternative but to file an appropriate action against the employer . . . ." (Id.) Mr. Feinberg's letter makes no reference to a termination and did not characterize her requested accommodation as a reinstatement; he used the language of reassignment. Plaintiff has produced no documentary evidence or corroborating testimony that this

incident was a termination.

Other undisputed facts indicate a continued employer-employee relationship. First, Plaintiff remained on active employment status after March 11, which is inconsistent with her termination as of that date, and consistent with being placed on reassignment. Plaintiff contends that this was an error or oversight. Second, Plaintiff met with Ms. Martone to discuss placement in a new position, which was part of the reassignment process and presumably not typical for an employee recently terminated. Third, human resources and benefits representatives continued to behave as if Plaintiff were employed. Plaintiff admits that benefits representatives believed she was still employed. (Pl. Resp. to Def. SMF ¶ 20.) In April, a human resources project administrator prepared a notice to Plaintiff that she was in arrears for her medical benefit contribution, and needed to pay to continue coverage. (Def. Ex. I [Docket Item 121-5].) Plaintiff testified she did not recall receiving any notices. (Pl. Resp. to Def. SMF ¶ 17-19.) Fourth, Plaintiff testified that she was aware she was required to make payments to continue to receive benefits, which is inconsistent with her termination in March. (Def. SMF ¶ 16; Pl. Resp. to Def. SMF ¶ 16 ("Admitted. However, she also testified that 'I couldn't get benefits if I wasn't at the job.'").) At most, Plaintiff evidences her own confusion about her job status after March 11, but none of this confusion is traceable to the Defendant's responsible

employees; any confusion by Plaintiff is thus immaterial. Fifth, Plaintiff received vacation pay for the days of March 12 & 13 and May 16, 17, 18, 19 & 20, and sick pay for March 11 and May 11 & 12, which is inconsistent with her being terminated on March 11. (Hildebrand Aff. Ex. A [Docket Item 122-1]). This was a total of ten days on and after March 11 for which Plaintiff was compensated.

Plaintiff contends that her termination in March is self-evident, because she was told she could not continue as a dealer and she never returned to work for Defendants. (Pl. Opp'n at 7.) She argues that "the word 'terminate' in this context is synonymous with the words 'stop' or 'cease.' And there can be no question that Ms. Taliaferro's employment ceased as of 3/11/11, when she was instructed to stop working as a dealer, and never returned to active employment." (Pl. Opp'n at 8-9.) But in her opposition brief Plaintiff points to no communication from Defendants or other evidence that she was terminated in March. She points only to the "Position Reassignment" letter, and asserts in her own testimony that she thought she was terminated in March. This evidence indicates only that Plaintiff believed she was terminated but provides no objective basis for so determining.

The record contains evidence that Plaintiff submitted an Unemployment Compensation claim on March 13, listing the "Reason for Separation" as "Lack of Work." (Def. Ex. 33.) The fact that an

individual receives unemployment benefits, however, is not evidence that she was terminated. See N.J.A.C. § 12:17-2.1 (defining "partial unemployment" as someone "employed not more than 80 percent of the hours normally worked in that individual's occupation . . . due to lack of work" and whose compensation "does not exceed the weekly benefit rate plus 20 percent of such rate") (emphasis added); N.J.A.C. § 12:17-6.3 (describing how to file a claim for "partial unemployment"); Dehaquiz v. Bd. of Review & Target Corp. of Minn., No. A-2999-11T4, 2013 WL 5658800, at *1 (N.J. Super. Ct. App. Div. Oct. 18, 2013) (describing a plaintiff who received unemployment compensation after experiencing an "involuntary reduction in her work hours"). Her claim is consistent with applying for partial unemployment benefits for "lack of work" under N.J.A.C. § 12:17-2.1, supra, during the period when an alternative placement was being sought. As noted above, Defendants did not contest Plaintiff's claim for unemployment benefits for "lack of work" consistent with its policy of assisting employees' applications when the casino is not busy (Def. Reply at 8 n.5), again in furtherance of a "partial unemployment" benefit. It was thus appropriate for someone who was underemployed -- whose normal hours had been cut by 20 percent due to "lack of work" -- to apply for and receive partial unemployment benefits even remaining in an employment relationship. Plaintiff has not created a dispute of material fact that a March termination

occurred or caused the loss of her benefits.

Because, as Plaintiff admits, her argument depends on a finding that Plaintiff was terminated on March 11, 2011 (prior to her nonpayment of premiums), and because no reasonable juror could conclude, based on the undisputed facts and viewing the evidence in the light most favorable to the Plaintiff, that Plaintiff's employer-employee relationship was terminated in March, the Court must find in favor of Defendants.[15]

## V. Conclusion

For the reasons explained above, Plaintiff's motion for summary judgment on the LAD claim (Count I) is denied and Defendants' cross-motion is granted. Defendants' motion for summary judgment on the COBRA notice claim (Count II) is granted. An accompanying Order will be entered for summary judgment in favor of Defendants on all counts.

December 11, 2013
Date

s/ Jerome B. Simandle
JEROME B. SIMANDLE
Chief U.S. District Judge

---

[15] Plaintiff does not argue that a reduction in hours is a qualifying event here, and she makes no attempt to show that a reduction in hours caused the nonpayment of her premiums.